**William SHEEHAN, Plaintiff,**

v.

**Christine GREGOIRE,
et al., Defendants.**

**No. C02–1112C.**

United States District Court,
W.D. Washington,
at Seattle.

May 22, 2003.

Elena Garella, Attorney at Law, Seattle, WA, for Plaintiff William Sheehan.

Janine Joly, Oma L. LaMothe, King County Prosecuting Attorney, Civil Div., Seattle, Seattle, WA, for Defendant Norm Maleng, King County Prosecutor.

James K. Pharris, Carol A. Murphy, Attorney General of Washington, Olympia, WA, for Defendant Christine Gregoire, Attorney General of Washington.

## ORDER

COUGHENOUR, Chief Judge.

This matter comes before the Court on plaintiff's motion for summary judgment (Dkt. No. 14) and defendants' cross-motion for summary judgment (Dkt. No. 18). The Court has considered the papers submitted by the parties and determined that oral argument is not necessary. For the following reasons, plaintiff's motion for summary judgment is hereby GRANTED and defendants' cross-motion for summary judgment is hereby DENIED.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On April 3, 2002, Governor Gary Locke signed ESSB 6700, enacting it into law. On June 13, 2002, Wash. Rev.Code §§ 4 24 680–.700 ("the statute") became effective. Section 4 24 680 dictates:

A person or organization shall not, with the intent to harm or intimidate, sell, trade, give, publish, distribute, or otherwise release the residential address, residential telephone number, birthdate, or social security number of any law enforcement-related, corrections officer-related, or court-related employee or volunteer, or someone with a similar name, and categorize them as such, without the express written permission of the employee or volunteer unless specifically exempted by law or court order.

In response to the statute,[1] plaintiff, who operates the website <*www.justicefiles.org.*>, removed the residential addresses, residential telephone numbers, birthdates, and social security numbers ("personal identifying information") of all law enforcement-related, corrections officer-related, or court-related employees or volunteers from his website. Plaintiff also filed this action challenging the constitutionality of the statute under the First and Fourteenth Amendments of the United States Constitution. Plaintiff asserts that the statute unconstitutionally proscribes his freedom of speech.[2]

---

1. Section 4.24.690 dictates:

 (1) Whenever it appears that any person or organization is engaged in or about to engage in any act that constitutes or will constitute a violation of RCW 4.24.680, the prosecuting attorney or any person harmed by an alleged violation of RCW 4.24.680 may initiate a civil proceeding in superior court to enjoin such violation, and may petition the court to issue an order for the discontinuance of the dissemination of information in violation of RCW 4.24.680.
 (2) An action under this section shall be brought in the county in which the violation is alleged to have taken place, and shall be commenced by the filing of a verified complaint, or shall be accompanied by an affidavit.
 (3) If it is shown to the satisfaction of the court, either by verified complaint or affidavit, that a person or organization is engaged in or about to engage in any act that constitutes a violation of RCW 4.24.680, the court may issue a temporary restraining order to abate and prevent the continuance or recurrence of the act.
 (4) The court may issue a permanent injunction to restrain, abate, or prevent the continuance or recurrence of the violation of RCW 4.24.680. The court may grant declaratory relief, mandatory orders, or any other relief deemed necessary to accomplish the purposes of the injunction. The court may retain jurisdiction of the case for the purpose of enforcing its orders.

 Section 4.24.700 dictates:
 A law enforcement-related, corrections officer-related, or court-related employee or volunteer who suffers damages as a result of a person or organization selling, trading, giving, publishing, distributing, or otherwise releasing the residential address, residential telephone number, birthdate, or social security number of the employee or volunteer in violation of RCW 4.24.680 may bring an action against the person or organization in court for actual damages sustained, plus attorneys' fees and costs.

2. Although the parties devote little attention to the issue, it is necessary to briefly discuss the nature of plaintiff's speech, as expressed via his website. Plaintiff's website is generally directed to the issue of police accountability. Thus, his speech is political and pertains to a subject of legitimate public interest. Defendants do not challenge this assertion. For example, the website contains news articles questioning the depth and sincerity of an internal police investigation after the death of a bicyclist, addressing the criminal history of individual officers, and discussing the difficulty of serving process or subpoenas on officers. *See* May 2002 Printed Version of Website, Attached to Plaintiff's Complaint (Dkt. No. 1). Plaintiff believes that the disclosure of lawfully-obtained, publicly-available personal identifying information regarding individual officers is a necessary tool to communicate and achieve his political message of police accountability. For example, he advocates use

It is undisputed that neither the prosecuting attorney nor any other individual has initiated an action against plaintiff pursuant to the statute. Therefore, because the statute has never actually been applied to plaintiff's speech, he mounts a strictly facial challenge to the statute's constitutionality. The parties now cross-move for summary judgment with respect to the facial constitutionality of Wash. Rev.Code §§ 4 24 680–700. Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c) (2003), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For purposes of plaintiff's facial challenge, the parties stipulate to the absence of any genuine issues of material fact. Therefore, the challenge is appropriately resolved as a matter of law.

## II. PLAINTIFF'S OVERBREADTH CHALLENGE

■ The First Amendment to the United States Constitution, applied to the State of Washington via the Fourteenth Amendment, provides that "Congress shall make no law abridging the freedom of speech." Any statute proscribing a form of pure speech must be interpreted in light of the commands of the First Amendment. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). A statute may be facially unconstitutional if it seeks to prohibit such a broad range of protected speech that it is unconstitution-

ally overbroad. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The Supreme Court has repeatedly held that such statutes are subject to facial challenge because they may inhibit and deter free expression and constitutionally protected speech, regardless of whether the speech of the party challenging the statute might be constitutionally proscribed by a more narrow statute. *See, e.g., Id.* at 798–99, 104 S.Ct. 2118 (quotations and citations omitted), *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), *Gooding v. Wilson,* 405 U.S. 518, 520–21, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).[3] An overbreadth challenge of this sort represents an exception to general standing requirements, the litigant's own free speech rights need not be violated. *Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908, *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir.1998).

■ However, the overbreadth of a statute must not only be real, but also substantial in relation to the statute's plainly legitimate sweep. *Taxpayers for Vincent,* 466 U.S. at 799–800, 104 S.Ct. 2118 (citations omitted), *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908. That is, there must be a realistic danger that the statute will significantly compromise recognized First Amendment protections. *Taxpayers for Vincent,* 466 U.S. at 800–01, 104 S.Ct. 2118 (citations omitted). "[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an over-

---

of such information to achieve service of process, research criminal history, and to "organize an informational picket [at individual officers' homes] or other lawful forms of civic involvement to force accountability."

**3.** The "transcendent value to all society of constitutionally protected expression is

deemed to justify allowing attacks on overly broad statutes because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of sanctions provided by a statute susceptible to application to protected expression." *Taxpayers for Vincent,* 466 U.S. at 799 n. 17, 104 S.Ct. 2118 (citations omitted).

breadth attack." *Id.* at 800 n. 19, 104 S.Ct. 2118 (citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)). Likewise, a statute that purports, by its own language, to proscribe constitutionally protected political speech is unconstitutional. *Brandenburg v. Ohio,* 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).[4] A successful challenge to the facial constitutionality of a statute invalidates the statute itself. *Foti,* 146 F.3d at 635.

A. *The Statute Does Not Proscribe True Threats or Any Other Proscribable Mode of Speech*

 Defendants first argue that the statute is not substantially overbroad because it proscribes an unprotected mode of speech true threats. The First Amendment does not protect certain *modes* of speech or expression, including true threats, fighting words, incitements to imminent lawless action, and classes of lewd and obscene speech. *Cohen v. California,* 403 U.S. 15, 19–20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), *Watts,* 394 U.S. at 708, 89 S.Ct. 1399, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), *Planned Parenthood v. Am. Coalition of Life Activists,* 290 F.3d 1058, 1070 (9th Cir.2002). However, the First Amendment protects speech that advocates violence, so long as that speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action. *Brandenburg,* 395 U.S. at 447, 89 S.Ct. 1827, *Planned Parenthood,* 290 F.3d at 1072. "A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." *Brandenburg,* 395 U.S. at 448, 89 S.Ct. 1827.

 Defendants argument is premised on the following statement. "The release of personal identifying information regarding individuals, together with the intent to harm or intimidate, constitutes a threat." Because this statement, as a matter of law, is fundamentally incorrect, defendants argument must fail. "Whether a particular statement may properly be considered to be a threat [for purposes of the First Amendment] is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Planned Parenthood,* 290 F.3d at 1074 (citations omitted). In determining whether a true threat exists, one may consider the context and circumstances surrounding the statement. *Id.* at 1077. However, a true threat does not turn on the subjective intent of the speaker. *Virginia v. Black,* —— U.S. ——, 123 S.Ct. 1536, 1547–48, 155 L.Ed.2d 535 (2003); *Planned Parenthood,* 290 F.3d at 1075–76 ("It is not necessary that the defendant intend to, or be able to carry out his threat, the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat.").

Defendants assert that the instant case is highly analogous to *Planned Parenthood.* This assertion is flawed on several levels. There, the statute at issue, the Freedom of Access to Clinics Entrances Act (FACE), regulated "threat[s] of force." *Id.* at 1062 (citing 18 U.S.C. § 248). In sharp contrast, the word "threat" appears nowhere in the statute at issue here, rather, the statute regulates the mere release of personal identifying information. *Com-*

---

4. Yet, a Court should hesitate before facially invalidating a statute when the statute proscribes speech or conduct admittedly within the state's power to proscribe. *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

*pare* Wash. Rev.Code § 9A 46.020 (2003) (criminal harassment statute requires person "knowingly threatens" another), *State v. Williams,* 144 Wash.2d 197, 207–10, 26 P.3d 890 (2001) (criminal harassment statute constitutional to extent it proscribes true threats and fighting words consistent with First Amendment jurisprudence). That is, on its face, the statute *does not purport to regulate true threats* or any other proscribable *mode* of speech,[5] but pure constitutionally-protected speech. Defendants cite no authority for the proposition that truthful lawfully-obtained, publicly-available personal identifying information constitutes a mode of constitutionally proscribable speech. Rather, disclosing and publishing information obtained elsewhere is precisely the kind of speech that the First Amendment protects. *Bartnicki v. Vopper,* 532 U.S. 514, 527, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001).

In *Planned Parenthood,* the issues were whether the Ninth Circuit could define "threat of force" consistent with the First Amendment and whether defendants' speech constituted a true threat, and thus, could be proscribed by the statute. In answering the first question, the Ninth Circuit cited a provision of FACE explicitly precluding its application to "any expressive conduct protected from legal prohibition by the First Amendment to the Constitution." *Planned Parenthood,* 290 F.3d at 1071. No such provision exists here. In answering the second question, the Ninth Circuit discussed the defendants' speech and the relevant context[6] and circumstances before concluding that it constituted a "threat of force" under FACE and a true threat for purposes of

the First Amendment. *Id.* at 1063–66, *see also United States v. Hart,* 212 F.3d 1067 (8th Cir.2000) (use of Ryder trucks may constitute true threat and "threat of force" under FACE). Interestingly, in *Planned Parenthood,* the American Civil Liberties Union urged the Ninth Circuit to add a subjective component to the objective "true threat" standard:

> [The Court should] require evidence, albeit circumstantial or inferential in many cases, that the speaker actually *intended* to induce fear, intimidation, or terror, namely, that the speaker intended to threaten. If a person did not intend to threaten or intimidate (*i.e.,* did not intend that his or her statement be understood as a threat), then the speech should not be considered to be a 'true threat,' unprotected by the First Amendment.

290 F.3d at 1075–76 (emphasis in original). The Ninth Circuit explicitly rejected this proposed standard *Id.* at 1076. The Ninth Circuit concluded that the purpose behind removing true threats from First Amendment protection "is not served by hinging constitutionality on the speaker's subjective intent or capacity to do (or not to do) harm." *Id.*

Nevertheless, defendants now suggest that *subjective intent alone* can transform otherwise constitutionally-protected speech—never before designated as a proscribable mode of speech—into a true threat. This sweeping suggestion brazenly contradicts *Planned Parenthood* and all other relevant case law, true threats do not hinge on the speaker's subjective intent. Here, the statute hints at no objec-

---

5. In addition, defendants cite no Washington case law indicating that Washington courts construe such statutory language (pure speech + intent to harm or intimidate) as reaching only true threats *Compare R.A.V. v. City of St. Paul,* 505 U.S. 377, 380–81, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

6. Some of the posters at issue included the full names and home addresses of physicians who provided abortion services. *Planned Parenthood,* 290 F.3d at 1064–65.

tive standard whatsoever. Therefore, the statute, on its face, simply does not regulate true threats as defined by First Amendment jurisprudence.[7] The statute's flaw is further demonstrated by the fact that even if an individual revealed the personal identifying information of a law enforcement-related employee to issue a true threat, that individual would be immune from the statute so long as he or she could demonstrate that he or she lacked the subjective intent to harm or intimidate.

Similarly, *Virginia v. Black* is fundamentally distinguishable from the instant case. The Virginia statute at issue banned cross burning performed with the intent to intimidate a person or group of persons. —— U.S. at *4, 123 S.Ct. 1536. The Supreme Court devoted several pages to expounding the history of the Ku Klux Klan, cross burning, its message of intimidation, and the nature of true threats. *Id.* at *8–*11, 123 S.Ct. 1536.[8] The Court noted that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at *11, 123 S.Ct. 1536. The Court concluded that Virginia could constitutionally proscribe cross burning because "of cross burning's long and pernicious history as a signal of impending violence" and because

it is "intended to create a pervasive fear in victims that they are a target of violence." *Id.* at *11, *13, 123 S.Ct. 1536. The Supreme Court relied upon the following essential premise cross-burning, *in and of itself,* is a subset of a proscribable *mode* of speech true threats.

Defendants mis-cite *Virginia v. Black* for the proposition that a "statement, combined with the intent to harm or intimidate, constitutes a threat." As discussed above, *Virginia* dealt solely with one specific statement—cross burning—which the Supreme Court concluded was proscribable as a true threat. In stark contrast, defendants cite no historical or anecdotal evidence for the proposition that the speech at issue here—personal identifying information—in and of itself, has a "long and pernicious history as a signal of impending violence," and thus, may be proscribed as a subset of true threats. Rather, the speech at issue here is merely names, addresses, and numbers. Although defendants suggest that subjective intent alone transforms such pure speech into a true threat,[9] this position is unsupported by any authority.

B. *The Statute Punishes Publication of Information and Serves No State Interest of the Highest Order*

In *The Florida Star v. B.J.F.*, the Supreme Court articulated the following

---

7. Although defendants argue that it is "the threat to intimidate, accompanied by publishing" personal identifying information that constitutes a violation of the statute, this argument attempts to rewrite the plain language of the statute to say something it simply does not say.

8. "From the inception of the second Klan, cross burnings have been used to communicate both threats of violence and messages of shared ideology. Often, the Klan used cross burnings as a tool of intimidation and a threat of impending violence. These cross burnings embodies threats to people whom the Klan

deemed antithetical to its goals. The person who burns a cross directed at a particular person often is making a serious threat. In sum, while a burning cross does not inevitably convey a message of intimidation, often the cross burner intends that the recipients of the message fear for their lives. And when a cross burning is used to intimidate, few if any messages are more powerful."

9. Inexplicably, defendants assert that "the motivation" behind the statement is not prohibited by the statute at issue here. However, "the motivation", i.e., the intent of the speaker, is the *only* thing prohibited by the statute.

First Amendment principle: "If a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (citations omitted), *see also Bartnicki,* 532 U.S. at 527, 121 S.Ct. 1753. In *The Florida Star,* a Florida statute made it unlawful to print, publish, or broadcast in mass communication the name of any victim of a sexual offense. 491 U.S. at 526, 109 S.Ct. 2603. A newspaper published the name of such a victim after obtaining the information lawfully from a local government office. *Id.* at 527, 109 S.Ct. 2603. The Court noted that the "matter of public significance," for purposes of First Amendment analysis, was not the victim's name, but rather the commission and investigation of a crime reported to authorities. *Id.* at 536–37, 109 S.Ct. 2603. The Court also noted that the principle articulated only protects the publication of information *lawfully*-obtained, thus providing the state ample means to safeguard any significant interests. *Id.* at 534, 109 S.Ct. 2603.

The victim, who asserted the claim against the newspaper, proffered three "state interest[s] of the highest order" protecting the privacy of victims of sex offenses, preventing and protecting victims from retaliation by assailants, and encouraging victims to come forward without fear of exposure. *Id.* at 537, 109 S.Ct. 2603. Nevertheless, the Court concluded that there was no demonstrated need to further a state interest of the highest order. The Court's reasoning merits extended quotation:

> [P]unishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act. [W]here the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release. [W]here the government itself provides information to the media, it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech. Where, as here, the government has failed to police itself in disseminating information, it is clear that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity. [T]he facial underinclusiveness of [the statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes. [The statute] does not prohibit the spread by other means of the identifies of victims of sexual offenses. When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition even-handedly. Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose.

*Id.* at 535–41, 109 S.Ct. 2603. The Supreme Court reiterated these concerns recently in *Bartnicki v. Vopper.* "[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." 532 U.S. at 529–30, 121 S.Ct. 1753.

█ In considering plaintiff's overbreadth challenge, the Court finds *The Florida Star* particularly relevant. Plaintiff argues that the statute impermissibly deters free expression, such as that con-

tained on his website. Plaintiff's website, a vehicle of mass communication, is analytically indistinguishable from a newspaper. It communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance police accountability. For example, the website contains a news article questioning the depth and sincerity of an internal police investigation after the death of a bicyclist and advocates lawful picketing in front of officers' homes. Defendants do not dispute that plaintiff's speech is political in nature or addresses a matter of public significance. Moreover, as in *The Florida Star*, plaintiff lawfully obtains the bulk of the information he communicates from government agencies.

However, defendants argue that the statute represents a need to further a state interest of the highest order protecting law enforcement-related, corrections officer-related, and court-related employees from harm and intimidation. The Court disagrees. As noted in *The Florida Star*, when the government itself places information in the public domain, it must be presumed that the government concludes the public interest is thereby served. 491 U.S. at 535, 109 S.Ct. 2603. Here, the Washington State Court of Appeals made clear that plaintiff has the right to obtain the names of law enforcement-related employees a matter of "legitimate public interest." *King County v. Sheehan*, 114 Wash.App. 325, 345–47, 57 P.3d 307 (2002).[10] In making this determination, the Court of Appeals specifically considered the fact that plaintiff could use the names to access other personal identifying information from other government sources. *Id.* at 332–33, 57 P.3d 307. Al-

though defendants seek to distinguish *The Florida Star* as addressing only the state interest of privacy, harm and intimidation was specifically identified as a state interest at issue "the physical safety of such victims, who may be targeted for retaliation if their names become known to their assailants." 491 U.S. at 537, 109 S.Ct. 2603. The Supreme Court rejected this argument. Further, as the Supreme Court reasoned, "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535, 109 S.Ct. 2603. Similarly, the "facial underinclusiveness" of the statute raises additional questions about those interests. *Id.* at 540, 109 S.Ct. 2603. As plaintiff notes, for-profit commercial entities remain perfectly free to sell, trade, give, or release personal identifying information to third-parties who intend to harm or intimidate individuals purportedly protected by the statute.

### C. The Statute is a Content–Based Restriction on Free Speech

 A content-based statute is presumptively invalid, the First Amendment precludes the government from proscribing speech because it disapproves of the ideas expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). A statute is content-based when it prohibits otherwise permitted speech based solely on the subjects addressed by the speech. *Id.* at 381, 112 S.Ct. 2538. Determining whether a statute is content-based is not a simple task, it may involve looking at the purpose behind the regulation. *Bartnicki*, 532 U.S. at 526,

---

**10.** The Court of Appeals noted that police officers are public employees paid with public tax dollars who hold a great deal of power, authority, and discretion. It also noted that investigative reporting may be based on information obtained from public records contain-

ing the names of police officers. *Sheehan*, 114 Wash.App. at 345–47, 57 P.3d 307. Plaintiff engages in such investigative reporting by seeking to reveal prior arrests and convictions of those vested with such power, authority, and discretion.

121 S.Ct. 1753. When an individual enforcing a statute must examine the content of the speech to determine whether the statute governs, the statute is content-based. *S.O.C. Inc. v. County of Clark,* 152 F.3d 1136, 1145 (9th Cir.1998), *Foti,* 146 F.3d at 635–36.

 A statute is content-neutral if it is justified without reference to the content of the regulated speech. *S.O.C., Inc.,* 152 F.3d at 1145. Similarly, a statute is content-neutral when it regulates constitutionally proscribable *modes* of speech *directed at* certain individuals. *R.A.V.,* 505 U.S. at 388–93, 112 S.Ct. 2538. For example, the federal government may proscribe true threats directed at the President only. *Watts,* 394 U.S. at 708, 89 S.Ct. 1399. That is, there is no "underinclusiveness limitation" upon the government's prohibition of proscribable speech. *R.A.V.,* 505 U.S. at 387, 112 S.Ct. 2538. However, a statute is content-based when it regulates *mere statements,* not falling within a proscribable mode of speech, *about* certain subjects or individuals.

 Here, on its face, the statute is content-based. The statute prohibits constitutionally protected speech—revealing truthful lawfully-obtained, publicly-available personal identifying information—based solely on the subjects addressed by that speech—whether the information identifies law enforcement-related, corrections officer-related, or court-related employees. To enforce the statute, the prosecuting attorney must determine whether the personal identifying information revealed is that of law enforcement-related, corrections officer-related, or court-related employees. This requires the examination of content because the statute does not proscribe, for example, revealing the personal identifying information of City Hall-related or State Legislature-related employees. Further, because the statute regulates pure speech rather than any constitutionally proscribable *mode* of speech, such as true threats, it does not constitute a content-neutral prohibition of proscribable speech directed at certain individuals.[11] The statute's "with the intent to harm or intimidate" provision does nothing to alleviate its content-based nature.

Defendants also contend that the statute is properly analyzed as a time, place, or manner regulation aimed at the "secondary effects" of the proscribed speech the potential harm to and intimidation of those whom the statute seeks to protect. However, listeners' reactions to speech or the motive impact of speech on its audience is not a secondary effect. *R.A.V.,* 505 U.S. at 394, 112 S.Ct. 2538 (quotations and citations omitted). As plaintiff notes, defendants' rationale would allow the secondary effects doctrine to completely swallow the First Amendment. It would grant the government a dangerous tool to proscribe any speech based solely on the government's speculation as to what harms might result from its utterance.

### D. *The Statute Does Not Serve a Compelling State Interest*

 A content-based restriction on free speech is only constitutional if it is narrowly tailored to serve a compelling state interest. *S.O.C., Inc.,* 152 F.3d at 1145–46. The government can assert no compelling interest in suppressing speech based on the content of that speech "when the speaker intends to communicate[,] but permitting the same speech if incidental to another activity." *Foti,* 146 F.3d at 639. That is, the government cannot claim any

---

**11.** If the statute actually purported to regulate true threats, it would be permissible to proscribe only true threats directed at law enforcement-related, corrections officer-related, or court-related employees so long as the statute did not discriminate based on the content of those threats. *See R.A.V.,* 505 U.S. at 384–92, 112 S.Ct. 2538.

such interest is served by focusing solely on the intent of the speaker. *Id.* at 640.

■ The Court's analysis here substantially overlaps with the discussion of *The Florida Star* in Part II.B. above. Defendants assert a compelling state interest in protecting law enforcement-related, corrections officer-related, and court-related employees from harm and intimidation.[12] However, when the government itself injects personal identifying information into the public domain, it cannot credibly take the contradictory position that one who compiles and communicates that information offends a compelling state interest.[13] Further, defendants can demonstrate no compelling interest because the statute hinges solely on the subjective intent of the speaker. Any third party wishing to actually harm or intimidate these individuals may freely acquire the personal identifying information from myriad public and private sources, including for-profit commercial entities, without entering the scope of the statute.[14] Yet, defendants argue. "Even the fact that an individual may gather the same information and use that information to harm someone does not detract from the state's compelling interest behind prohibiting the publication or dis-

tribution of such information with the intent to harm or intimidate." Thought-policing is *not* a compelling state interest recognized by the First Amendment. The State Court of Appeals noted, "Sheehan's intended use of the information cannot be a basis for denying disclosure. To conclude otherwise would be to allow agencies to deny access to public records to its most vocal critics, while supplying the same information to its friends." *Sheehan,* 114 Wash.App. at 341, 57 P.3d 307. This reasoning also resonates in the First Amendment context. Accordingly, defendants fail to demonstrate any compelling state interest behind the statute.[15]

### E. *The Statute is Not Readily Susceptible to a Narrowing Construction*

■ Although the parties do not raise the issue, the Court should not facially invalidate a statute for overbreadth unless the statute is not "readily subject to a narrowing construction by the state courts and its deterrent effect on legitimate expression is both real and substantial." *Erznoznik,* 422 U.S. at 216, 95 S.Ct. 2268 (citations omitted), *see also Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908 (1973).[16] However, the Court may only impose a limiting

---

**12.** Defendants also suggest that the statute is directed to the compelling state interest of preventing identity theft. The Court's reasoning equally applies to this purported interest. The state can assert no compelling interest in identity theft when the statute wholly fails to proscribe the public availability of or ability to transact in personal identifying information.

**13.** Although defendants may claim a compelling state interest in preventing threats, the statute itself does not proscribe threats.

**14.** In fact, the legislative history makes clear that the legislature sought to exclude such entities from the statute's coverage.

**15.** Further, defendants argue that the testimony before the state legislature demonstrates the "real and substantial harm" that officers

"could" face if their personal identifying information is released under "improper" circumstances. However, "before imposing such a significant burden on free expression, the government must do far more than merely speculating about the possibility of serious harms." *Bartnicki,* 532 U.S. at 532, 121 S.Ct. 1753.

**16.** For example, the Supreme Court shall not entertain a facial overbreadth claim when a state's highest court has already construed the statute at issue consistent with the First Amendment. *See, e.g., R.A.V.,* 505 U.S. at 380–81, 112 S.Ct. 2538 (Minnesota Supreme Court limits statute's application to "fighting words"), *Chaplinsky,* 315 U.S. at 573–74, 62 S.Ct. 766 (New Hampshire high court construes statute to only prohibit words likely to incite imminent breach of peace).

construction to rescue a statute from facial challenge if the statute is readily susceptible to that construction, the Court may not rewrite a statute or insert missing terms to conform it to constitutional standards. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884–85, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), *Foti*, 146 F.3d at 639. The Court may look to the statute's plain language or other sources of legislative intent to determine if a statute is readily susceptible to a limiting construction. *Reno*, 521 U.S. at 884, 117 S.Ct. 2329. Of course, the Court may not adopt an interpretation of a statute precluded by its plain language. *S.O.C., Inc.*, 152 F.3d at 1143–44.

Defendants' principle argument implicitly invites the Court to narrowly construe the statute such that it governs only true threats. However, as discussed in detail above, the plain language of the statute does not regulate true threats, which turn on an objective standard. Rather, the plain language of the statute limits its scope solely to the subjective intent of the speaker. Because the Ninth Circuit explicitly rejected this subjective standard as a relevant element of the objective true threats standard in *Planned Parenthood*, the interpretation urged by defendants is precluded by the plain language of the statute. Moreover, defendants wholly fail to cite any Washington case law [17] construing the language "with the intent to harm or intimidate" in such a way as to suggest the language only governs true threats, as outlined by First Amendment jurispru-

dence. *Compare Gooding*, 405 U.S. at 524–27, 92 S.Ct. 1103 *with R.A.V.*, 505 U.S. at 380–81, 112 S.Ct. 2538 *and Chaplinsky*, 315 U.S. at 573–74, 62 S.Ct. 766. Finally, the statute's legislative history, which focuses on plaintiff's website, does not lend the statute to a constitutional narrowing construction.

## III. PLAINTIFF'S VOID FOR VAGUENESS CHALLENGE

▇▇▇▇ Plaintiff also challenges the facial validity of the statute on grounds that it is unconstitutionally vague. A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at the statute's meaning. *Broadrick*, 413 U.S. at 607, 93 S.Ct. 2908. The statute should be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Id.* at 608, 93 S.Ct. 2908 (citations omitted). The vagueness of statutory language raises special First Amendment concerns because of the "obvious chilling effect" on free speech. *Reno*, 521 U.S. at 865, 871–72, 117 S.Ct. 2329 (finding terms "indecent" and "patently offensive" unconstitutionally vague because not defined with reference to First Amendment standards).[18] Specifically, plaintiff argues that the statutory language "with the intent to harm or intimidate" does not satisfy these constitutional standards. Defendants argue that the language "intent to harm or intimidate" is ordinary and has a specific, common meaning.[19] Further, de-

---

**17.** Although defendants cite numerous other statutes employing an intent to harm or intimidate requirement, these statutes have no bearing on the instant discussion. That is, these statutes do not convert *constitutionally protected political speech* into true threats based solely on the intent of the speaker.

**18.** The Supreme Court reasoned: "Given the vague contours of the coverage of the statute,

it unquestionably silences some speakers whose messages would be entitled to constitutional protection. That danger provides further reasons for insisting that the statute not be overly broad." *Reno*, 521 U.S. at 874, 117 S.Ct. 2329.

**19.** Defendants correctly note that the constitution does not demand mathematical certainty or precision definitions.

fendants argue that the language does not invite subjective or discriminatory enforcement.

■ Defendants arguments fail for several reasons. First, as discussed in detail above, defendants cling to the false notion that "intent to harm or intimidate" means "true threat" when the Ninth Circuit has expressly rejected that definition. Thus, the plain language of the statute does not regulate the constitutionally proscribable mode of speech that defendants suggest it regulates. Second, it is difficult to comprehend how the statute does not invite subjective enforcement when the prosecuting attorney, and then a jury, must discern the subjective intent of the speaker. The statute fundamentally lacks reference to any objective standards. When statutory language is so broad that it "effectively licenses the jury to create its own standard in each case," the susceptibility of improper application is constitutionally unacceptable. *Gooding*, 405 U.S. at 528, 92 S.Ct. 1103 (internal quotations and citations omitted).

■ Third, a statute that demands self-censorship—that one police one's own thoughts and subjective intent—impermissibly sacrifices the public interest in the free exchange of speech and ideas. *See The Florida Star*, 491 U.S. at 535, 109 S.Ct. 2603. This chills free speech. Finally, when statutory language is vague and the statute is obviously adopted to target the political activities of specific persons, such language makes discriminatory enforcement a real possibility. *Foti*, 146 F.3d at 638–39 (citations omitted). Here,

it is readily apparent that the legislature adopted the statute to specifically target plaintiff's political activities.[20] Therefore, in addition to the statute's other fatal flaws, the language "with the intent to harm or intimidate" does not provide the person of ordinary intelligence a reasonable opportunity to know the speech prohibited. The language is unconstitutionally vague.[21]

## IV. CONCLUSION

As the foregoing makes clear, the First and Fourteenth Amendments preclude the State of Washington from proscribing pure speech based solely on the speaker's subjective intent. Likewise, there is cause for concern when the legislature enacts a statute proscribing a type of political speech in a concerted effort to silence particular speakers. Defendants' position is troubling. Defendants' boldly assert the broad right to outlaw any speech—whether it be anti-Semitic, anti-choice, radical religious, or critical of police—so long as a jury of one's peers concludes that the speaker subjectively intends to intimidate others with that speech. This brash stance strikes at the core of the First Amendment and does not comport with constitutional requirements. "[P]utting [certain individuals] in harm's way by singling them out for the attention of unrelated but violent third parties is [conduct] protected by the First Amendment." *Planned Parenthood*, 290 F.3d at 1063. Moreover, once the government places personal identifying information in the public domain, reliance must rest on the judgment of those who

**20.** As plaintiff demonstrates, the legislative history does little to aid the credibility of defendants' arguments here. For example, the May 2002 printed version of plaintiff's website would not constitute a true threat, yet the legislative history makes clear that the statute specifically intends to proscribe the content of that website.

**21.** Because the Court concludes that the statute is patently unconstitutional on its face for the several reasons discussed above, the Court declines to address plaintiff's argument that the statute is an unconstitutional prior restraint on protected First Amendment speech.

decide what to publish or broadcast. *The Florida Star*, 491 U.S. at 538, 109 S.Ct. 2603 (citations omitted).

The statute is substantially overbroad. Its deterrent effect on constitutionally protected speech is real and substantial. It does not regulate true threats or any other proscribable mode of speech. The statute punishes the communication of truthful lawfully-obtained, publicly-available information. The statute is content-based and it does not serve a compelling state interest or state interest of the highest order. In addition, defendants fail to demonstrate that the statute has *any* plainly legitimate sweep. Because the statute, on its face, does not purport to proscribe true threats, it is unclear what speech, within the statute's scope, defendants have the power to constitutionally proscribe. Further, the statute is not readily susceptible to any narrowing construction consistent with First Amendment standards. Finally, the statute is void for vagueness. Accordingly, Wash. Rev.Code §§ 4 24 680–700 is facially unconstitutional under the First and Fourteenth Amendments of the United States Constitution. The statute is invalid and unenforceable.

This Court does not intend to minimize the real fear of harm and intimidation that law enforcement-related, corrections officer-related, and court-related employees, and their families, may experience. As the State Court of Appeals noted, and the statute recognizes, judges and court employees are common targets of threats and harassment. However, we live in a democratic society founded on fundamental constitutional principles. In this society, we do not quash fear by increasing government power, proscribing those constitutional principles, and silencing those speakers of whom the majority disapproves. Rather, as Justice Harlan eloquently explained, the First Amendment demands that we confront those speakers with superior ideas:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Cohen*, 403 U.S. at 24–25, 91 S.Ct. 1780 (internal citations omitted). In sum, for the reasons set forth above, the Court GRANTS plaintiff's motion for summary judgment and DENIES defendants' cross motion for summary judgment. The clerk is directed to enter judgment accordingly.