UNITED STATES of America,
Plaintiff,

v.

**William WHITE, Defendant.**

**Case No. 08–CR–851.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 21, 2009.

---

Michael James Ferrara, AUSA, United States Attorney's Office, Chicago, IL, for Plaintiff.

## DECISION AND ORDER

LYNN ADELMAN, District Judge.

The government charged defendant William White with violating 18 U.S.C. § 373 by soliciting another person to harm the foreperson of the federal jury that convicted white supremacist leader Matthew Hale.[1] Defendant now moves to dismiss the indictment, to strike surplusage, and to vacate the orders of the judge, since recused, who was originally assigned to the case. I conclude that I must dismiss the indictment. I will, therefore, not address defendant's other motions.

## I. BACKGROUND

In 2003, a jury in the Northern District of Illinois convicted Hale of soliciting the murder of District Judge Joan Lefkow, who had presided over a civil case involving Hale's organization. *See TE–TA–MA Truth Foundation–Family of URI, Inc. v. World Church of the Creator*, 392 F.3d 248 (7th Cir.2004). Hale was sentenced to 480 months in prison. *See United States v. Hale*, 448 F.3d 971 (7th Cir.2006).

On October 21, 2008, the government indicted defendant, alleging that on his website, Overthrow.com, he solicited or otherwise endeavored to persuade another person to harm "Juror A," the Hale jury foreperson. Specifically, the government alleged that on or about September 11, 2008, defendant displayed on the front page of his website a post entitled, "The Juror Who Convicted Matt Hale." The post read:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale. Born [date], [he/she] lives at [address] with [his/her] gay black lover and [his/her] cat [name]. [His/Her] phone number is [phone number], cell phone [phone number], and [his/her] office is [phone number].

(Indictment [R. 5] at 2 ¶ 3, alterations in original.) The post did not expressly advocate that Juror A be harmed.

The indictment further alleged that on September 12, 2008, defendant displayed on the front page of his website a post entitled: "[Juror A] Update—Since They Blocked the first photo" and stating:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale. Born [date], [he/she] lives at [address] with [his/her] gay black lover and [his/her] cat [name]. [His/Her] phone number is [phone number], cell phone [phone number], and [his/her] office is [phone number]. Note that [University A] blocked much of [Juror A's] information after we linked to [his/her] photograph.

(Indictment at 3 ¶ 4, alteration in original.) This post also did not expressly advocate that Juror A be harmed.

As "circumstances strongly corroborative of [defendant's] intent" that another person harm Juror A, the indictment alleged that when he posted the above statements, defendant was aware that white supremacists, Overthrow.com's target audience, sometimes committed acts of violence against non-whites, Jews, homosexuals and others perceived as acting contrary to the interests of the white race. (Indict-

---

1. Title 18 U.S.C. § 373 provides: "Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that in- tent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned...." The indictment in the present case alleges that defendant solicited another to violate 18 U.S.C. § 1503, which prohibits harming a juror on account of his jury service.

ment at 3 ¶ 5.a.) The indictment also alleged that before he posted the above statements, defendant displayed on Overthrow.com other posts, some of which were still available, purporting to contain the home addresses of and/or other identifying information about individuals who had been criticized on the website, and that in certain of these posts, defendant expressed a desire that the individuals be harmed. (Indictment at 3–4 ¶ 5.b.)

For example, the indictment quoted a March 26, 2008 post regarding "Individual B," a Canadian civil rights lawyer who had published material regarding the use of the internet in hate crimes:

Kill [Individual B] Man Behind Human Rights Tribunal's Abuses Should Be Executed.

Commentary—[Individual B], the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found, easily, at his home, at [Address] . . .

We may no longer have the social cohesion and sense of purpose necessary to fight as a country, but those of us who have the social cohesion and sense of purpose necessary to unify as a race must take notice of an irreconcilable fact: [Individual B] is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree: [Address]

(Indictment at 4 ¶ 5.c.)

The indictment further alleged that on February 13, 2007, defendant posted material regarding Elie Wiesel, an internationally known Holocaust survivor and author, who had been attacked on February 1, 2007 by a man named Eric Hunt. The material was entitled "Where Elie Wiesel

Lives—In Case Anyone was Looking For Him," and it listed three addresses. The indictment also alleged that on February 21, 2007, defendant posted the following statement:

Elie Wiesel should be afraid to walk out his front door but for the rightful vengeance of white working people he and his holocaust lies have exploited. . . .

For decades, the Jews and the liars have used physical force, violent attacks on peaceful demonstrators and peaceful meetings, and the violent physical force of unjust and tyrannical laws to silence those who question the holocaust lie. If white people are going to undo this system, we have to be ready to adapt and use the tactics of our exploiters.

Insofar as my views may have played a role in motivating Mr. Hunt, I can only say that I hope to inspire a hundred more young white people to sacrifice themselves for our collective racial whole. The only thing more noble than sacrifice is victory.

Heil Hitler

(Indictment at 5 ¶ 5.d.) The indictment further alleged that on or about September 25, 2008, defendant displayed a post stating: "Last year, a fan of this website kidnapped Wiesel and tried to force him to confess his books on the 'Holocaust' were knowing lies." (Indictment at 6 ¶ 5.d.)

Finally, the indictment alleged that in September 2007, defendant posted an article entitled, "Addresses of the Jena 6 Niggers—In case Anyone Wants To Deliver Justice." (Indictment at 6 ¶ 5.e.) The article listed the names and addresses of six individuals involved in a highly publicized matter in Jena, Louisiana. And in response to a Virginia newspaper's criticism of the post, defendant posted a second article stating:

When the courts start enforcing laws against Internet threats and actual vio-

lence against anti-racists and the mainstream, Jewish owned media which finances and encourages them, I will stop broadcasting people's names and address[es] with the opinion they should be lynched. However, as long as we live in a society in which laws are not enforced against Jews, Marxists and other privileged members of the bourgeoisie, I will take advantage of that and use the lawless chaos they've created to push my view, which is that all Jews and Marxists (including their fellow traveling neo-cons, neo-liberals, Zionists and Judaized–Christians in both Republican and Democratic Parties) should be shot, rather than debated—along with their fellow travelers and chosen pets in the Negro 'rights' movement.

(Indictment at 6–7 ¶ 5.e.)

The case was originally assigned to Judge Hibbler, who on January 26, 2009, denied defendant's motions to dismiss, to strike surplusage from the indictment, and for a change of venue. On February 10, 2009, the government obtained a superseding indictment, which tracked the original indictment but also referred to additional posts allegedly corroborative of defendant's intent that Juror A be harmed, including a 2005 post relating to the February 28, 2005 murders of Judge Lefkow's husband and mother, which stated as follows:

The husband and mother of the judge who shut down the World Church of the Creator have been assassinated by white nationalists who are promising to kill every federal agent and Jewish official associated with the case. According to a statement released tonight to white nationalist news service, individuals identifying themselves as members of the World Church of the Creator took responsibility for the killings and promised that other bodies would follow . . .

The killing is not the first linked to the Creator group. Benjamin Smith, the most prominent, killed nine people and wounded two others in a 1999 shooting rampage . . .

According to a statement released to the white-oriented press, other individuals associated with the case, most likely federal informer Tony Evola . . . and other minor anti-racists who taunted and encouraged the frame-up of Hale, may be future targets.

After the Hale trial, this website published personal information on Tony Evola, the federal informer who originally set Hale up, leading FBI officials to say that they would do 'whatever was in their power' to shut this website down—something they have still not succeeded in doing . . .

(Superseding Indictment [R. 54] at 7–8 ¶ 5.f.)

The superseding indictment also quoted defendant's March 1, 2005 post entitled "I Don't Feel Bad About The Hit On Judge Lefkow—And I Don't Think Others Should, Either." (Superseding Indictment at 8 ¶ 5.g), as follows:

I don't feel bad that Judge Lefkow's family was murdered today. In fact, when I heard the story I laughed. 'Good for them!' was my first thought. Everyone associated with the Matt Hale trial has deserved assassination for a long time. At the time, I believe I said that if I were Hale and I was railroaded like this I would kill—not the judge—but the ADL officers involved and their witnesses. In general, I would not kill a judge's family—it strikes me as overly harsh—but in this case the family members were Jews (well, in one case a converso), and really I can't mourn over dead Jews. . . .

But the abstract question of the ethics of killing Jews in general must be set aside

here, because the meat of this question is whether it was just or unjust in this specific case for people who have been persecuted and denied their religion by the dictates of Judge Lefkow and the system she promotes to retaliate and wreck vengeance against her. In my view, it was clearly just, and I look forward to seeing who else this new white nationalist group of assassins kills next.

Judge Lefkow was the instrument by which the Jewish system of government in this country took from thousands of people in the religious creed which they held to be the truth. The ADL, through their lackeys in the TE–TA–MA foundation, were the specific group of Jews that directed and stage managed this persecution. What these people did to Matt Hale and the Creativity movement was evil, and they deserved to experience the consequences of the evil they had done . . .

Yesterday, when the ADL officials and FBI agents and federal prosecutors and federal judges who are responsible for the persecution of the white race went to bed, they had no fear that they would ever be held accountable for any unreasonable or immoral ruling against a white activist. White activists were ridiculed. They were mocked. They were the kind of silly Jewish-television-show bad guy that anyone could kick around and know they could get away with it. For all the propaganda alleging white activists were 'violent' 'terrorist' or 'dangerous,' to the Jewish system white nationalists were nothing more than a bunch of fringe losers, not to be taken seriously.

Tonight, as these same ADL officials and FBI agents and federal prosecutors and federal judges go to bed, they have to think that tomorrow they may wake up and find their families murdered. Just as anti-racists routinely terrorize the families of white activists, threatening rape and murder against people who have nothing but a relative who is a dissident, and the same ADL officials and FBI agents and federal prosecutors and federal judges can go to bed with the same vague feeling of unease and fear that they have inflicted and perpetuated through their miscarriage of justice, their subservience to evil, and their refusal to enforce the law.

I do not mourn the assassination of Judge Lefkow's family, and I hope the killer wrecks more havoc among the enemies of humanity, and the killer is never found. I do not say that because I have personal animosity for Judge Lefkow, or because I sick [sic] have a love of violence or death. What I love is justice, and this act of violence, publicized as it is to millions of those who passively engage in evil in the name of the Jew, sends a message of justice to those who thought they could be protected in the performance of evil.

Killing people—killing people's families—is not good. It is not a right thing to do. In a world that was right there would be no murder. But an eye for an eye is justice, and such acts of justice make me think, sometimes, that maybe there are some things still right with the world.

(Superseding Indictment at 9–10, ¶ 5.g.)

The superseding indictment further alleged that on March 1, 2005, defendant posted a statement that an e-mail with the home address of various federal prosecutors, agents and others involved in the Hale matter had been circulating among white nationalist discussion groups, and that it indicated that they could be the next targets of the killer of Judge Lefkow's husband and mother. The post further stated:

While Overthrow would usually not hesitate to republish the personal information of these scumbags in full, at this time we feel there is so great a potential for action linked to such posting that we are not going to post email and its details at this time.

. . .

Whether the email represents a legitimate threat, or just some angry activists blowing off steam, remains to be seen. After the unexpected assassination of Judge Lefkow's family, it seems that anything may be possible.

(Superseding Indictment at 11 ¶ 5.h.)

Finally, the superseding indictment alleged that on or about May 22, 2008, defendant posted an article entitled "Feeling Better," in which he stated:

Things have become progressively worse, day by day, and I have woke up more and more often feeling the need to kill, kill, kill, and I have tried to get through my day while ignoring the need to destroy the wicked. Its not been easy.

I realized the other day that I have, almost without realizing it—though that may seem a bit strange—developed a very intricate plot for the murder of about a score of Roanoke City's negro nuisances and their annoying counterparts at the Roanoke Times. I know everything about these assholes, where they live, who they live with, what they look like, where they go, when they go there. I estimate I could probably in the course of a few hours kill 15, 19 out of the 20 easy if I pick the right day and time, and still lived long enough to travel the country and begin picking off the ridiculous 'independent journalists' that staff the Southern Poverty Law Center's

Intelligence Report. I have a list of those as well.

(Superseding Indictment at 11–12 ¶ 5.i.)

After the government filed the superseding indictment, defendant moved to transfer the case to a federal court in Virginia,[2] to recuse all judges in the Northern District of Illinois and to disqualify the United States Attorney's Office in the Northern District of Illinois. The government did not contest defendant's motion to recuse, and Judge Hibbler granted it. On behalf of the Executive Committee, Chief Judge Holderman then recused all judges in the Northern District of Illinois, and the case was re-assigned me. I denied defendant's motions to transfer and to disqualify the prosecutors, and authorized defendant to file motions relating to the superseding indictment; as indicated, such motions are before me now.[3]

## II. APPLICABLE LEGAL STANDARDS

### A. Motion to Dismiss

Under Fed.R.Crim.P. 12(b)(3)(B), a defendant may move to dismiss an indictment for failure "to state an offense." A defendant may likewise move to dismiss an indictment when it seeks to punish speech protected by the First Amendment. *E.g., United States v. Baker,* 890 F.Supp. 1375, 1385 (E.D.Mich.1995), *aff'd sub nom., United States v. Alkhabaz,* 104 F.3d 1492 (6th Cir.1997); *see also United States v. Bly,* 510 F.3d 453, 457–58 (4th Cir.2007) (stating that whether "a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law," as is the issue of whether "an indictment properly charges a criminal offense"); *United*

---

**2.** The government has charged defendant in the Western District of Virginia with interstate transmission of threatening communications, in violation of 18 U.S.C. § 875(c).

**3.** The parties agree that I am not bound by any previous rulings in the case.

*States v. Popa,* 187 F.3d 672, 674–75 (D.C.Cir.1999) (reviewing de novo the defendant's pre-trial motion arguing that application of a statute to his speech violated the First Amendment).[4]

■ In ruling on a motion to dismiss, the court focuses on the allegations in the indictment, which it must accept as true. *E.g., United States v. Moore,* 563 F.3d 583, 586 (7th Cir.2009). While the indictment should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case, if the allegations in the indictment are insufficient to state a violation of the governing statute, the court may dismiss. *See United States v. Risk,* 843 F.2d 1059, 1061 (7th Cir.1988). In the present case, the parties treat the question of whether the government's allegations are sufficient to support a conviction under § 373 as one of law; neither side argues that further factual development is necessary. Therefore, I may properly determine whether the facts set forth in the indictment state an offense. *See id.* (holding that the district court properly dismissed an indictment where the parties argued the applicability of a statute based on a set of undisputed facts).

## B. Section 373 and the First Amendment

■ The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." In a democratic society, it is axiomatic that the Amendment's protections are not limited to the genteel, the enlightened or the tasteful. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle

underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Sixty years ago, the Supreme Court explained that:

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. There is no room under our Constitution for a more restrictive view.

*Terminiello v. City of Chicago,* 337 U.S. 1, 4–5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (internal citations omitted). Thus, the government may not ban speech that even "'a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (quoting *Whitney v. California,* 274 U.S. 357, 374, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)).

■ The Court recognizes that the Amendment's protections are not absolute and that legislative bodies may proscribe certain categories of expression. *Black,* 538 U.S. at 358, 123 S.Ct. 1536. As is relevant here, such categories include ad-

4. As the present case illustrates, when the government prosecutes a person based on the content of his speech, the inquiry into the sufficiency of the indictment is often intertwined with the First Amendment analysis.

*See Alkhabaz,* 104 F.3d at 1493 (affirming district court's dismissal of indictment on the ground that it failed to allege a violation of the statute, as construed by the court, rather than based on the First Amendment).

vocacy of the use of force or of violation of the law "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), "true threats," *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), i.e. "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Black*, 538 U.S. at 359, 123 S.Ct. 1536, and offers to engage in illegal transactions, *United States v. Williams*, — U.S. —, 128 S.Ct. 1830, 1841, 170 L.Ed.2d 650 (2008).[5] As the *Williams* Court stated, there is "an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality." 128 S.Ct. at 1842 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928–929, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Brandenburg*, 395 U.S. at 447–448, 89 S.Ct. 1827).

In its report on the Bill which became § 373, the Senate Judiciary Committee explained that it crafted the statute with these First Amendment limitations in mind. The Committee noted that some cases speak of:

> the need for a relatively high degree of proximity, probability, or seriousness in the evil the state seeks to prevent by the regulation of speech. Others have emphasized the need for incitement to unlawful activity, as opposed to abstract advocacy of the propriety of such activity. Still others have combined these themes, as in *Brandenburg v. Ohio*, where the standard was said to be that advocacy of the use of force or law violation could be proscribed only where it was "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

S. Rep. 97–307, at 180 (1981). The Committee quoted with approval a commentator's explanation of why the crime of solicitation would not ordinarily create a First Amendment issue:

> "Solicitation involves a hiring or partnership arrangement, designed to accomplish a specific action in violation of law, where the communication is an essential link in a direct chain leading to criminal action, though the action may have been interrupted. In short, the person charged with solicitation must, in a direct sense, have been a participant in an abortive crime of violence."

*Id.* at 181 (quoting Emerson, *Toward a General Theory of the First Amendment* 83 (1966)).

The Committee further explained that the proof required to establish the elements of the offense would, in most cases, obviate First Amendment issues. The government would first have to establish that the offender had the intent that another person commit a violent crime, and that the intent was manifested by circumstances strongly corroborative thereof. *Id.* at 182. "Included expressly in the first element is a requirement that the circumstances show that the actor is serious in his intention." *Id.* The Committee listed a number of circumstances that would be highly probative of intent, including an offer of payment or other promise of benefit to the person solicited if he would com-

---

5. Also unprotected are so-called "fighting words," i.e. those which "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Because the speech at issue here was "not 'directed to the person of the hearer,'" *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)), this exception does not apply in the present case.

mit the offense; a threat to the person solicited if he would not commit the offense; repeated solicitations or express protestations of seriousness in soliciting the commission of the offense; the defendant's knowledge that the person solicited previously committed similar offenses; and the fact that the defendant acquired weapons, tools or information suited for use by the person solicited, or made other preparations for the commission of the offense by the person solicited. *Id.* at 183.

Second, the government would have to establish that the defendant commanded, entreated, induced or otherwise endeavored to persuade the other person to commit the crime of violence. Congress specifically rejected words such as "counsels," "encourages" or "requests" because they suggest equivocation too close to casual remarks. *Id.* at 182. For example, an order to commit an offense made by a person to another with whom he stands in a relation of influence or authority would constitute a "command"; and threatening another if he will not commit an offense, or offering to pay him if he will, would constitute "inducement." *Id.* at 183. "The phrase 'otherwise endeavors to persuade' is designed to cover any situation where a person seriously seeks to persuade another person to engage in criminal conduct." *Id.* at 183–84.[6]

The Committee concluded that because the typical case would involve activity such

as an heir soliciting the murder of a relative from whom he expected to inherit, a person importuning another to commit arson on his business so he can collect insurance money, or an organized crime boss directing a subordinate to kill a rival gang leader, First Amendment issues were unlikely to arise. *Id.* at 181. However, in an unusual case in which such issues did arise, the Committee understood that the First Amendment principles discussed above would "operate as supplementary restrictions on the applicability of the section." *Id.* at 182.[7]

## III. ANALYSIS

█ For the following reasons, I conclude that defendant's speech, as alleged in the indictment, is protected by the First Amendment and does not state a violation of § 373.

### A. Posts Regarding Juror A

Defendant's posts regarding Juror A do not expressly solicit or endeavor to persuade another person to harm Juror A. Rather, they disclose personal information about Juror A and comment on his/her sexual orientation and attitude toward race. Although the posts may be reasonably read as criticizing Juror A's vote to convict Hale, nowhere in them does defendant expressly advocate that Juror A be harmed.[8]

---

6. In *Hale*, the Seventh Circuit agreed with this statement of the elements of the offense. 448 F.3d at 982 ("In order to meet its burden of proof on the solicitation count, the government had to establish (1) with 'strongly corroborative circumstances' that Hale intended for Tony Evola to arrange the murder of Judge Lefkow; and (2) that Hale solicited, commanded, induced, or otherwise tried to persuade Evola to carry out the crime."). The *Hale* court likewise quoted with approval the examples of circumstances strongly corroborative of intent set forth in Senate Report 97–307. *Id.* at 983.

7. *See also* S. Rep. 98–225, P. L. 98–473 (Aug. 4, 1983) ("The Committee wishes to makes it clear that what is involved is legitimately proscribable criminal activity, not advocacy of ideas that is protected by the First Amendment right of free speech.").

8. Although I base this decision on the allegations contained in the indictment, the parties advise that no actual harm befell Juror A; he/she simply received text messages from unknown sources.

■ Scrutiny and criticism of people involved in the investigation and prosecution of crimes is protected by the First Amendment. *See Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) (holding that the First Amendment protects the right to criticize a grand jury investigation); *see also Globe Newspaper Co. v. Superior Court for Norfolk County,* 457 U.S. 596, 605–06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (discussing the importance of public access to, and scrutiny of, criminal trials).[9] Such scrutiny may involve disclosure of information about the people involved. *See The Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (holding that the imposition of damages on a newspaper for publishing the name of a rape victim, lawfully obtained from a publicly released police report, in violation of a Florida statute and the newspaper's own internal policy, violated the First Amendment); *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (finding unconstitutional the indictment of two newspapers for violating a state statute barring publication, without written approval of the juvenile court, the name of any youth charged as a juvenile offender); *see also* Eugene Volokh, *Crime–Facilitating Speech,* 57 Stan. L. Rev. 1095, 1142–43 (2005) (discussing how the publishing of names and addresses can help people evaluate and participate in public debate, as well as facilitate lawful remonstrance and social ostracism).

## B. Alleged Corroborating Circumstances

In order to state an offense under § 373, the indictment must allege that defendant intentionally solicited or endeavored to persuade another person to harm Juror A,

under circumstances strongly corroborative of defendant's intent that the person commit a violent crime against Juror A. As stated, defendant's posts about Juror A do not expressly solicit or endeavor to persuade another person to harm him/her. Moreover, as discussed, defendant's posts about Juror A, in themselves, are protected by the First Amendment. Thus, the corroborating circumstances alleged must, consistent with the First Amendment, transform defendant's lawful statements about Juror A into a criminal solicitation. The corroborating circumstances alleged in the indictment fail to do so.

### 1. Defendant's Awareness That White Supremacists Sometimes Commit Violent Acts

■ The first alleged corroborating circumstance is that when he posted information about Juror A, defendant was aware that white supremacists, the target audience of Overthrow.com, sometimes committed acts of violence against persons viewed as acting against the interests of the white race. However, the fact that defendant knew that white supremacists sometimes viewed his website and sometimes harmed people they perceived as enemies is insufficient to transform his lawful statements about Juror A into criminal advocacy, i.e., advocacy directed to inciting or producing imminent lawless action, as required by the First Amendment and § 373. *See Brandenburg,* 395 U.S. at 447, 89 S.Ct. 1827. Knowledge or belief that one's speech, even speech advocating law breaking, may cause others to act does not remove the speech from the protection of the First Amendment, unless the speech is directed to inciting imminent lawless action and is likely to produce such action.

9. Defendant did not post information about Juror A *during* the Hale trial. Thus, I need not balance the fair administration of justice against the right to freedom of expression.

*Cf. Turney v. Pugh,* 400 F.3d 1197 (9th Cir. 2005) (distinguishing *Wood* and like cases in a jury tampering prosecution).

*See id.* (holding that the First Amendment protected an incendiary speech by a Ku Klux Klan leader to a Klan gathering); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("The prospect of crime ... by itself does not justify laws suppressing protected speech.").[10]

### 2. Defendant's Pre–Juror A Posts

The second alleged corroborating circumstance is that on several occasions ranging in time from six months to three years before his posts about Juror A, defendant posted information, sometimes including home addresses, about other individuals criticized on his website and sometimes expressed a desire that these individuals be harmed. Several of these posts were accessible to persons visiting Overthrow.com at the time defendant posted about Juror A. The government's theory with respect to defendant's pre-Juror A posts appears to be that because defendant previously disclosed personal information about individuals and expressed a wish that they be harmed, his lawful statements about Juror A could be found to be a violation of § 373. This theory is untenable. Defendant's other posts were created well before his Juror A posts, and none of them mention Juror A. The post closest in time to defendant's posts about Juror A, his May 22, 2008 "Feeling Better" post, discusses defendant's plot to personally kill people in Roanoke, Virginia, but like defendant's other pre-Juror A posts, it has no appar-

ent connection to defendant's statements about Juror A. Further, the fact that in some of his pre-Juror A posts, defendant may have expressed a wish that the individuals named be harmed is hardly sufficient to transform his lawful statements about Juror A into advocacy directed to inciting imminent lawless action and likely to cause such action as is required for the indictment to allege an offense under § 373 and the First Amendment.

### C. Case Law

It may not be necessary to discuss First Amendment case law any more than I already have. However, I find it significant that the cases relating to disclosure of personal information, even under threatening or intimidating circumstances, uniformly support the proposition that defendant's speech is protected.[11] In the interest of completeness, I will, therefore, discuss the *Claiborne Hardware* case, which was decided in 1982, and the more recent cases dealing with issues similar to those presented here.

In *Claiborne Hardware*, the Supreme Court considered a boycott by black citizens of white-owned businesses in Claiborne County, Mississippi. As is pertinent here, the boycott involved stationing individuals, known as "enforcers," "deacons" or "black hats," near white-owned businesses for the purpose of reporting blacks who violated the boycott. Boycott supporters read the names of such persons at meetings of the Claiborne County NAACP

**10.** The indictment alleges that defendant at times expressed satisfaction that others committed violent acts. However, the "approval of past violence by others cannot be made illegal consistent with the First Amendment." *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists* (hereafter *PPCW*), 290 F.3d 1058, 1091 n. 3 (9th Cir.2002) (Kozinski, J., dissenting) (citing *Hess v. Indiana*, 414 U.S. 105, 108–09, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Branden-*

*burg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Edwards v. South Carolina*, 372 U.S. 229, 237–38, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Noto v. United States*, 367 U.S. 290, 297–99, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)).

**11.** The present case involves an alleged solicitation rather than a threat; however, the cases often analyze such disclosures under both the true threat and incitement doctrines.

and at church services and published them in a mimeographed paper entitled the "Black Times." Such persons "were branded as traitors to the black cause, called demeaning names, and socially ostracized for merely trading with whites." 458 U.S. at 903–04, 102 S.Ct. 3409. Some also became targets of violence. *Id.* at 904, 102 S.Ct. 3409.

While acknowledging that persons who committed acts of violence could be held liable, the Supreme Court held that others involved in the boycott, including the leader, Charles Evers, could not be. This was so despite Evers's statements that "blacks who traded with white merchants would be *answerable to him,*" *id.* at 900 n. 28, 102 S.Ct. 3409, that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people," *id.* at 900 n. 28, 102 S.Ct. 3409, that if "we catch any of you going in any of them racist stores, we're gonna break your damn neck," *id.* at 902, 102 S.Ct. 3409, that "boycott violators would be 'disciplined' by their own people" and "that the Sheriff could not sleep with boycott violators at night," *id.* at 902, 102 S.Ct. 3409.

Regarding this aspect of the boycott, the Court noted that speech does not lose its protected character "simply because it may embarrass others or coerce them into action." *Id.* at 909–10, 102 S.Ct. 3409. Even when the speech arguably contains threats of violence, "in the context of constitutionally protected activity ... 'precision of regulation' is demanded." *Id.* at 916–17, 102 S.Ct. 3409 (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). The Court thus held that, although the "black hats" who engaged in violence could be punished, there "is nothing unlawful in standing outside a store and recording names. Similarly, there is nothing unlawful in wearing black hats, although such apparel may cause apprehension in others." *Id.* at 925, 102 S.Ct. 3409.

Finally, the Court held that Evers could not be held liable for his statements about the boycott violators:

While many of the comments in Evers' speeches might have contemplated "discipline" in the permissible form of social ostracism, it cannot be denied that references to the possibility that necks would be broken and to the fact that the Sheriff could not sleep with boycott violators at night implicitly conveyed a sterner message. In the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended.

It is clear that "fighting words"—those that provoke immediate violence—are not protected by the First Amendment. Similarly, words that create an immediate panic are not entitled to constitutional protection. This Court has made clear, however, that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. In *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430, we reversed the conviction of a Ku Klux Klan leader for threatening "revengeance" if the "suppression" of the white race continued; we relied on "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.,* at 447, 89 S.Ct., at 1829. *See Noto v. United States,* 367 U.S., at 297–298, 81 S.Ct., at 1520 ("the mere abstract teaching ...

of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action").

The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg* .... Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."

*Id.* at 927–28, 102 S.Ct. 3409 (internal citations and footnotes omitted).[12]

In the present case, defendant also disclosed the identity of a person, Juror A, with whom he disagreed on a matter of social importance, i.e. the conviction of Hale in a high profile criminal case. Although he did so under potentially intimidating circumstances, as *Claiborne Hardware* holds, even when the circumstances surrounding a disclosure are intimidating, the speech may not be punished consistent with the First Amendment unless it is directed to inciting imminent lawless action and likely to produce such action. Defendant's speech lacked both of these characteristics.

In *PPCW*, a case which split the en banc Ninth Circuit Court of Appeals 6–5, the majority upheld a damages award and injunctive relief against anti-abortion ac-

tivists under the Freedom of Access to Clinics Entrances Act ("FACE"). The defendants in *PPCW* created "wanted" posters, some of which included personal information about the abortion providers depicted, including home addresses, and operated a website called the "Nuremberg Files," which also included personal information about the providers—with lines drawn through the names of doctors killed or wounded. 290 F.3d at 1062–63.

*PPCW* supports my conclusion here. First, unlike the present case, which involves a solicitation to commit a crime of violence, *PPCW* was a "true threat" case. Realizing that they could not show that the defendants' communications were likely to produce the imminent unlawful action required by *Brandenburg*, the *PPCW* plaintiffs did not even attempt to support their claims under an incitement theory. *Id.* at 1092 n. 5 (Kozinski, J., dissenting). Second, under both the *PPCW* majority and dissenting opinions, defendant's disclosures about Juror A are protected under the First Amendment.

The *PPCW* majority held that under the circumstances present there, which included statements by the defendants supporting violence against abortion providers, a backdrop of actual violence against the providers depicted on the posters (including murders), and the posters themselves, which carried a historical connotation of "wanted—dead or alive," the posters represented a true threat. *Id.* at 1071, 1079–80. However, the majority found the website "somewhat different." *Id.* at 1080. It stated that the defendants created the site for the purpose of:

"collecting dossiers on abortionists in anticipation that one day we may be able

---

12. In *PPCW*, Judge Kozinski characterized the *Claiborne Hardware* holding as follows: "In other words, even when public speech sounds menacing, even when it expressly calls for violence, it cannot form the basis of liability

unless it amounts to incitement or directly threatens actual injury to particular individuals." 290 F.3d at 1095 (Kozinski, J., dissenting).

to hold them on trial for crimes against humanity." The web page states: "One of the great tragedies of the Nuremberg trials of Nazis after WWII was that complete information and documented evidence had not been collected so many war criminals went free or were only found guilty of minor crimes. We do not want the same thing to happen when the day comes to charge abortionists with their crimes. We anticipate the day when these people will be charged in PERFECTLY LEGAL COURTS once the tide of this nation's opinion turns against child-killing (as it surely will)." However offensive or disturbing this might be to those listed in the Files, being offensive and provocative is protected under the First Amendment. But, in two critical respects, the Files go further. In addition to listing judges, politicians and law enforcement personnel, the Files separately categorize "Abortionists" and list the names of individuals who provide abortion services, including, specifically, Crist, Hern, and both Newhalls. Also, names of abortion providers who have been murdered because of their activities are lined through in black, while names of those who have been wounded are highlighted in grey. As a result, we cannot say that it is clear as a matter of law that listing Crist, Hern, and the Newhalls on both the Nuremberg Files and the GUILTY posters is purely protected, political expression.

Accordingly, whether the Crist Poster, the Deadly Dozen poster, and the identification of Crist, Hern, Dr. Elizabeth Newhall and Dr. James Newhall in the Nuremberg Files as well as on "wanted"-type posters, constituted true threats was properly for the jury to decide.

*Id.* at 1080.[13]

Thus, the majority found that simply identifying and providing personal information about the providers on the website, while offensive and disturbing, was protected by the First Amendment. Liability was possible *only* because the defendants (1) highlighted the names of the doctors who had been killed or injured, and (2) also depicted the doctors on the wanted posters that the court had found threatening. The speech alleged in the present case is not comparable. Defendant did not threaten Juror A either directly or through wanted posters. He did nothing more than disclose personal information regarding Juror A and criticize him.

The *PPCW* dissenters concluded that both the posters and the website were protected by the First Amendment. Speaking for the dissenters, Judge Kozinski explained that neither the website nor the posters were overtly threatening and that speech does not lose its protected character because it may embarrass, frighten or intimidate. *Id.* at 1089–90. Regarding the highlighting of names on the website, Judge Kozinski wrote: "At most, the greying out and strikeouts could be seen as public approval of those actions, and approval of past violence by others cannot be made illegal consistent with the First Amendment." *Id.* at 1091 n. 3.

Judge Kozinski further noted that the providers' fear came not from the defendants who created the posters or the website, or those acting in direct concert with them, "but from being singled out for attention by abortion protesters across the country," *id.* at 1091, and that although from the providers' perspective it made

**13.** The majority later reiterated that the Nuremberg Files website, standing alone, was protected, "because the First Amendment does not preclude calling people demeaning or inflammatory names, or threatening social ostracism or vilification to advocate a political position." *Id.* at 1086.

little difference whether the violence came from the defendants or others, it did make a difference under the First Amendment.

Where the speaker is engaged in public political speech, the public statements themselves cannot be the sole proof that they were true threats, unless the speech directly threatens actual injury to identifiable individuals. Absent such an unmistakable, specific threat, there must be evidence *aside from the political statements themselves* showing that the public speaker would himself or in conspiracy with others inflict unlawful harm. 458 U.S. at 932–34, 102 S.Ct. 3409. The majority cites not a scintilla of evidence—other than the posters themselves—that plaintiffs or someone associated with them would carry out the threatened harm.

Given this lack of evidence, the posters can be viewed, at most, as a call to arms for other abortion protesters to harm plaintiffs. However, the Supreme Court made it clear that under *Brandenburg,* encouragement or even advocacy of violence is protected by the First Amendment: "[M]ere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware,* 458 U.S. at 927, 102 S.Ct. 3409 (citing *Brandenburg,* 395 U.S. at 447 [89 S.Ct. 1827]) (emphasis in the original).

*Id.* at 1092. In the present case, defendant's posts about Juror A are disturbing

because of the possibility that others might respond to them, but the cases hold that the government may not, consistent with the First Amendment, criminalize general calls to action.

Nor does § 373, construed consistently with the First Amendment and congressional intent, criminalize general calls to action. Because defendant's posts about Juror A, standing alone or considered in conjunction with the other posts referenced in the indictment, do not include a solicitation or entreaty that Juror A be injured, I need not decide whether § 373 may ever be used to punish a general call to action. However, the legislative history of § 373 indicates that Congress contemplated—and the reported cases generally involve—the solicitation of specific individuals.

■ In order to ensure that § 373 only punishes speech that is intended to incite imminent lawless action and is likely to produce such action, as required by the First Amendment and contemplated by Congress, courts considering solicitation cases should construe the statute to require (1) that the solicitation be communicated to a specific person or group of persons, rather than to a general audience or the public at large, and/or (2) that the corroborating circumstances relate specifically to the alleged solicitation at issue and not consist of unrelated threats, general calls for violence and other intemperate statements.[14] In the present case, defen-

---

**14.** The Seventh Circuit's opinion in *Hale* is consistent with this construction of § 373. First, Hale solicited a specific person, Tony Evola (who turned out to be an FBI informant), to murder Judge Lefkow. Prior to the solicitation, Hale had designated Evola as his "head of security" and leader of the "White Berets," the World Church's "'elite' fighting force." *Id.* at 976. Thus, Hale stood in a position of direct influence or authority over Evola, and despite the equivocation in some of Hale's statements Evola clearly understood

Hale to be soliciting Judge Lefkow's murder. *Id.* at 983. Second, the government presented a detailed course of dealings between Hale and Evola leading up the solicitation, which corroborated defendant's intent that Evola commit the crime. *Id.* at 976–79, 983–84. The court did uphold the admission of Hale's statements praising the shooting rampage of Benjamin Smith, also a Hale follower, but only because those statements provided context for Hale's dealings with Evola. In other words, Hale's statements about Smith were

dant communicated his statements about Juror A on a website available to the general public rather than to a specific person or group of persons, and the alleged corroborating posts do not mention or relate to Juror A. Thus, even assuming that § 373 may criminalize some general calls to action and that defendant's posts about Juror A could be construed as such a call, the corroborating circumstances set forth in the indictment are plainly insufficient.[15]

The dissent in *PPCW* made a related point that is also relevant to the present case, noting:

> There is no allegation that any of the posters in this case disclosed private information improperly obtained. We must therefore assume that the information in the posters was obtained from public sources. All defendants did was reproduce this public information in a format designed to convey a political viewpoint and to achieve political goals. The "Deadly Dozen" posters and the "Nuremberg Files" dossiers were unveiled at political rallies staged for the

purpose of protesting *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)], .... The Nuremberg Files website is clearly an expression of a political point of view. The posters and the website are designed both to rally political support for the views espoused by defendants, and to intimidate plaintiffs and others like them into desisting abortion-related activities. This political agenda may not be to the liking of many people—political dissidents are often unpopular—but the speech, including the intimidating message, does not constitute a direct threat because there is no evidence other than the speech itself that the speakers intend to resort to physical violence if their threat is not heeded.

*Id.* at 1092–93. In the present case, the indictment does not allege that defendant obtained the information about Juror A improperly. Further, although Juror A undoubtedly found the posting of his/her name and address unsettling, for the reasons stated above, the speech cannot be criminalized.[16]

---

relevant to the solicitation at issue, which also involved a follower. *Id.* at 985. Even so, the court of appeals considered admission of such statements "a close question." *Id.* at 986. The court did not endorse the wholesale introduction of previous threats or intemperate statements made by Hale relating to individuals unconnected to Evola as corroborative of Hale's intent. Although I need not address the issue in ruling on the instant motion to dismiss, I note that defendant has also filed a motion under Fed.R.Evid. 404(b) seeking to exclude virtually all of the evidence the government seeks to use as strong corroboration of his intent.

**15.** Professor Volokh suggests that speech communicated entirely to people who the speaker knows will use it for criminal purposes has virtually no First Amendment value and therefore may be banned without interfering with valuable uses of speech. Volokh, *supra*, at 1142–43. On the other hand, the case for restricting speech is much weaker when the speaker distributes material that has

valuable as well as harmful uses and has no meaningful way of limiting his audience to benign users. *Id.* at 1176. When speech is communicated to the public at large, most listeners will focus on the social criticisms, rather than being moved to commit crimes. *Id.* n. 194. Professor Volokh further notes that the law of aiding and abetting and crime facilitation developed in cases where the defendant knew that he was helping a particular person commit a crime. *Id.* n. 147.

**16.** As Judge Berzon explained in her dissent in *PPCW:*

> Where there is no threat, explicit or implicit, that the speaker or someone under his or her control intends to harm someone, a statement inducing fear of physical harm must be either (1) a prediction or warning of injury, or (2) an inducement or encouragement of someone else to cause the injury. The former is, as Judge Kozinski suggests, clearly entitled to protection under the First Amendment as either informative or persuasive speech. The latter kind of

In *United States v. Carmichael,* 326 F.Supp.2d 1267, 1272 (M.D.Ala.2004), the government sought a protective order prohibiting the defendant, charged with drug offenses, from operating a website containing—beneath the word "wanted" in large red letters—the names and likeness of agents and informants involved in the case, along with a request for information about them. The government alleged that the site constituted harassment of witnesses, contrary to 18 U.S.C. §§ 1512 & 1514, and sought an order limiting him to posting information in the case record. *Id.* at 1273. The government argued that the site encouraged retaliation against witnesses, discouraged witnesses from coming forward and hindered undercover officers. *Id.* at 1273–74. Two informants depicted on the site testified that they felt apprehensive, and agents testified that due to an "atmosphere of intimidation" other potential witnesses had declined to cooperate in the case. *Id.* at 1275.

The court acknowledged that § 1514 authorized it to issue the requested order but noted that the First Amendment limited its authority. *Id.* at 1279. It then considered the posted language and the context in which the defendant created the site. *Id.* at 1280–81. The court first noted that the defendant had posted no threats and in fact had disclaimed any intent to threaten. *Id.* at 1281. It then compared the defen-

dant's statements to those in *United States v. Khorrami,* 895 F.2d 1186, 1189 (7th Cir.1990), which also involved a wanted poster. In *Khorrami,* the court of appeals affirmed the defendant's conviction for violating 18 U.S.C. § 876, which prohibits the mailing of threatening communications. Khorrami mailed to the Jewish National Fund ("JNF") a "poster-like paper that state[d] at its top 'Wanted for crimes against humanity and Palestinians for fifty years.'" *Id.* at 1189. The poster featured photographs of Israeli political figures, disfigured with swastikas and epithets, and the statements "His blood need," "Must be killed," and "Execute now!" next to some of the photos. *Id.* In addition, Khorrami repeatedly called the JNF, leaving obscene and threatening telephone messages, and he mailed it a threatening letter. *Id.* at 1188–90. Applying an objective, reasonable person standard, the *Khorrami* court held that, in light of the defendant's other actions, "there was more than sufficient evidence to support the jury's conclusion that [the defendant's] 'wanted poster' constituted a 'true threat.'" *Id.* at 1193.

The *Carmichael* court noted that the posts under its consideration were not nearly as threatening as the wanted poster in *Khorrami.* The defendant's site did not refer to killing, execution or blood and contained no disfigured photographs or epithets. Nor did the defendant contact indi-

statement may or may not be protected. Whether it is or not must be governed by the strict inducement standard of *Brandenburg* if the more than fifty years of contentious development of the protection of advocacy of illegal action is not to be for naught. *Id.* at 1106. Judge Berzon further explained that one can

justify a somewhat different standard for judging the constitutionality of a restriction upon threats than for a restriction upon inducement of violence or other illegal action. There is a difference for speech-protective purposes between a statement that one oneself intends to do something and a

statement encouraging or advocating that someone else do it. The latter will result in harmful action only if someone else is persuaded by the advocacy. If there is adequate time for that person to reflect, any harm will be due to another's considered act. The speech itself, in that circumstance, does not create the injury, although it may make it more likely. The Supreme Court has essentially decided that free expression would be too greatly burdened by anticipatory squelching of advocacy which can work harm only indirectly if at all. *Id.* As stated, the indictment in the present case charges a solicitation not a threat.

viduals featured on his site. *Id.* at 1281–82. The court acknowledged that the term "informant," which the defendant used, had a negative connotation, but stated that:

> The First Amendment, however, does not prohibit name-calling. The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks" as well as language that is "vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708, 89 S.Ct. 1399. Further, the First Amendment protects such speech even when it is designed to embarrass or otherwise coerce another into action. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Thus, "threats of vilification or social ostracism" are protected by the First Amendment and outside the reach of § 1512. *Id.* It is only when speech crosses the line separating insults from "true threats" that it loses its First Amendment protection.

*Id.* at 1282. Similarly, in the present case, while clearly identifying Juror A, defendant's posts contain no threat. And, defendant's derogatory comments about Juror A's sexual orientation and attitude towards race are protected.

The *Carmichael* court proceeded to consider context, first contrasting the case before it with *PPCW*. Unlike in *PPCW*, the defendant in *Carmichael* did not create his website after a string of murders and violence linked to similar publications. *Id.* at 1284. The court also considered the broader context of violence against informants in drug cases, stating: "Viewed in light of the general history of informants being killed in drug conspiracy cases and the evidence of a drug-conspiracy and other criminal activity in this case, www. carmichaelcase.com looks more like a threat. Indeed it may be that it is only this context that gives the site a threatening meaning." *Id.* at 1285.

Nevertheless, it is important to recall that the inquiry here is whether a reasonable person would view Carmichael's website as a serious expression of an intention to inflict bodily harm, not whether the site calls to mind other cases in which harm has come to government informants, not whether it would be reasonable to think that Carmichael would threaten an informant, and not whether Carmichael himself is somehow threatening. Context can help explain the website's meaning, but it is the website that is the focus of the court's inquiry. Although the broad social context makes the case closer, the background facts described above are too general to make the Carmichael case site a "true threat."

*Id.* at 1285 (internal citations and quote marks omitted).

Most relevant to the present case, the *Carmichael* court also considered whether, even if the site did not contain a threat, it encouraged others to harm those depicted. *Id.* at 1286.

> The problem with this argument is that [it] implicates the Supreme Court's stringent "incitement" doctrine. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). *Brandenburg* stands for the proposition that, as a general rule, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation." *Id.; see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment"). To fall outside the First Amendment's protection, advocacy of violence must be "directed to inciting or producing imminent lawless action and

[be] likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827. There is no evidence that Carmichael's site meets the imminency requirement of *Brandenburg*. Indeed, in *Planned Parenthood*, Judge Kozinski in dissent noted that there was so little chance of proving that the posters and website in that case met the imminency requirement in *Brandenburg* that the plaintiffs did not even raise the argument. 290 F.3d at 1092 n. 5 (Kozinski, J., dissenting). Thus, the court cannot proscribe Carmichael's site as constitutionally unprotected advocacy of violence.

*Id.* at 1287. The court also found the case analogous to *Claiborne Hardware:*

> Like Evers, Carmichael has used language with a threatening connotation, and, as with Evers, there is no evidence that he has authorized, ratified, or directly threatened acts of violence. If Evers's literal threat—"If we catch any of you going in any of them racist stores, we're going to break your damn necks,"—was not outside the First Amendment's protection, it is hard to see how Carmichael's use of language with at most only non-specific threatening connotations could be unprotected.

*Id.* at 1288 (internal citations and quote marks omitted).

The *Carmichael* court acknowledged that the case involved the internet, and that some commentators had suggested that the internet's unique features made information posted on-line more threatening. *Id.* at 1288 (citing articles). The court nevertheless found the site protected:

> First, notwithstanding the commentary cited above, the Supreme Court has held that speech on the internet is subject to no greater or lesser constitutional protection than speech in more traditional media. *Reno*, 521 U.S. at 870, 117 S.Ct.

2329. Second, the general rule in the case law is that speech that is broadcast to a broad audience is less likely to be a "true threat," not more. *United States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir.1993) ("correspondence ... delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering"); *Planned Parenthood*, 290 F.3d at 1099 (Kozinski, J., dissenting) ("[S]tatements communicated directly to the target are much more likely to be true threats than those ... communicated as part of a public protest."). Thus, to the extent that the government's concern is that Carmichael's website will be seen by a lot of people, that fact makes the site look less like a "true threat," not more.

*Id.* at 1288–89.

■ Finally, the court considered that while the defendant had a First Amendment interest in publicizing his trial and criticizing the prosecution, his posts of the names and photographs of witnesses might not constitute political advocacy or involve a matter of social importance. *Id.* at 1290. Nevertheless, the court concluded that because speech is presumptively protected by the First Amendment and because the government had failed to demonstrate that the defendant's speech fell within an excepted category, the site was protected. *Id.* I reach the same result here. The posting of personal information about an individual involved in a judicial proceeding, even under circumstances that are intimidating or unsettling, cannot, absent a true threat or an incitement to imminent lawless action, be criminalized consistent with the First Amendment.

In *Sheehan v. Gregoire*, 272 F.Supp.2d 1135, 1139 (W.D.Wash.2003), the court considered a statute providing:

A person or organization shall not, with the intent to harm or intimidate, sell, trade, give, publish, distribute, or otherwise release the residential address, residential telephone number, birthdate, or social security number of any law enforcement-related, corrections officer-related, or court-related employee or volunteer, or someone with a similar name, and categorize them as such, without the express written permission of the employee or volunteer unless specifically exempted by law or court order.

The plaintiff in *Sheehan* operated a website, www.justicefiles.org, which criticized police officers. In response to the statute quoted above, he removed personal identifying information about law enforcement officers, corrections officers and court employees and volunteers from his site, and then challenged the statute under the First Amendment. *Id.*

The defendants first defended the statute as proscribing threats. The court rejected the argument:

[O]n its face, the statute does not purport to regulate true threats or any other proscribable mode of speech, but pure constitutionally-protected speech. Defendants cite no authority for the proposition that truthful lawfully-obtained, publicly-available personal identifying information constitutes a mode of constitutionally proscribable speech. Rather, disclosing and publishing information obtained elsewhere is precisely the kind of speech that the First Amendment protects. *Bartnicki v. Vopper*, 532 U.S. 514, 527, 121 S.Ct. 1753, 149 L.Ed.2d 787.

*Id.* at 1141–42 (footnote omitted). The defendants cited no historical or anecdotal evidence indicating that the disclosure of personal identifying information had a long and pernicious history as a signal of impending violence, like the cross burning at issue in *Virginia v. Black*, which might enable the court to regard it as a true threat. The court rejected the notion that revealing names, addresses and phone numbers, coupled with a subjective intent to intimidate, could transform pure speech into a true threat. *Id.* at 1143.

The defendants next argued that the statute only banned speech lacking public significance and served the important state interests of preventing harassment and retaliation. *Id.* at 1144. Citing *Florida Star*, the court rejected this argument, finding that the plaintiff's website, a vehicle of mass communication, was analytically indistinguishable from a newspaper, and that it communicated truthful, lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance—police accountability. *Id.* at 1145. The court noted that *Florida Star* also involved a concern with physical safety, that of crime victims who could be targeted for retaliation if their names become known to their assailants. *Id.* at 1145 (citing 491 U.S. at 537, 109 S.Ct. 2603). The Justices nevertheless held that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star*, 491 U.S. at 535, 109 S.Ct. 2603. Finally, the court noted that, under the statute, for-profit commercial entities remained perfectly free to sell, trade, give, or release personal identifying information to third-parties who intend to harm or intimidate individuals purportedly protected by the statute, making the statute significantly under-inclusive. *Sheehan*, 272 F.Supp.2d at 1145.

The court thus determined that the statute prohibited constitutionally protected speech based on content, and that its "with the intent to harm or intimidate" provision did not alleviate the constitutional prob-

lem. The court rejected the defendants' contention that the statute could be analyzed as a time, place and manner regulation aimed at the "secondary effects" of the speech, i.e. the potential harm to and intimidation of those covered by the law.

[L]isteners' reactions to speech or the motive impact of speech on its audience is not a secondary effect. As plaintiff notes, defendants' rationale would allow the secondary effects doctrine to completely swallow the First Amendment. It would grant the government a dangerous tool to proscribe any speech based solely on the government's speculation as to what harms might result from its utterance.

*Id.* at 1146 (internal citations omitted).

Defendants assert a compelling state interest in protecting law enforcement-related, corrections officer-related, and court-related employees from harm and intimidation. . . . Any third party wishing to actually harm or intimidate these individuals may freely acquire the personal identifying information from myriad public and private sources, including for-profit commercial entities, without entering the scope of the statute. Yet, defendants argue, "Even the fact that an individual may gather the same information and use that information to harm someone does not detract from the state's compelling interest behind prohibiting the publication or distribution of such information with the intent to harm or intimidate." Thought-policing is not a compelling state interest recognized by the First Amendment.

*Id.* at 1147 (internal citations and footnotes omitted).

The court concluded:

As the foregoing makes clear, the First and Fourteenth Amendments preclude the State of Washington from proscribing pure speech based solely on the speaker's subjective intent. Likewise,

there is cause for concern when the legislature enacts a statute proscribing a type of political speech in a concerted effort to silence particular speakers. Defendants' position is troubling. Defendants boldly assert the broad right to outlaw any speech—whether it be anti-Semitic, anti-choice, radical religious, or critical of police—so long as a jury of one's peers concludes that the speaker subjectively intends to intimidate others with that speech. This brash stance strikes at the core of the First Amendment and does not comport with constitutional requirements. "[P]utting [certain individuals] in harm's way by singling them out for the attention of unrelated but violent third parties is [conduct] protected by the First Amendment." *Planned Parenthood,* 290 F.3d at 1063. . . .

This Court does not intend to minimize the real fear of harm and intimidation that law enforcement-related, corrections officer-related, and court-related employees, and their families, may experience. [J]udges and court employees are common targets of threats and harassment. However, we live in a democratic society founded on fundamental constitutional principles. In this society, we do not quash fear by increasing government power, proscribing those constitutional principles, and silencing those speakers of whom the majority disapproves. Rather, as Justice Harlan eloquently explained, the First Amendment demands that we confront those speakers with superior ideas:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each

of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Id.* at 1150 (quoting *Cohen,* 403 U.S. at 24–25, 91 S.Ct. 1780).

Finally, in *City of Kirkland v. Sheehan,* No. 01–2–09513–7, 2001 WL 1751590, at *1 (Wash.Super.Ct. May 10, 2001), the defendants also operated a website critical of law enforcement personnel, which contained political argument and disclosed the names, addresses, birth dates, telephone numbers, Social Security numbers ("SSNs") and other personal information about law enforcement personnel and their relatives. The defendants offered to remove the information pertaining to police officers in any jurisdiction that would "admit" that police officers are public officials, agree to accept service for officers, and created a "civilian review board" having a

certain composition. The court found this "willingness to trade back plaintiffs' privacy for certain policy changes could be argued to bear some resemblance to blackmail." *Id.* at *5.

Nevertheless, the court found the site (aside from its publication of SSNs) protected: [17]

Upon the facts presented to date in this case, reprehensible though some may find defendants' proposed bargain to be (trading privacy for policy changes), it is clear that defendants' utterances are indeed political speech. In *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 929 [102 S.Ct. 3409, 73 L.Ed.2d 1215] (1982), the Supreme Court ruled that publicly reading the names of persons who disregarded a boycott and threatening that they would be "disciplined" and saying "we're gonna break your damn neck" could be viewed as intending to create a fear of violence but was not sufficient to grant relief because the speaker had not thereby "authorized, ratified or directly threatened" acts of violence.

In this case, as in numerous others, in the absence of a credible specific threat of harm, the publication of lawfully obtained addresses and telephone numbers, while certainly unwelcome to those who had desired a greater degree of anonymity, is traditionally viewed as having the ability to promote political speech. Publication may arguably expose wrongdoers and/or facilitate peaceful picketing of homes or worksites and render other communication possible.

**17.** Public dissemination of information like social security numbers and computer passwords "is unlikely to facilitate any political activity (unlike, say, publicly distributing abortion providers' or boycott violators' names, which may facilitate lawful shunning and social pressure, or even their addresses, which may facilitate lawful residential picketing and parading)." Volokh, *supra,* at 1146. Thus, dissemination of such information may be distinguished from the publication of names and addresses.

*Id.* at *6. I reach the same result here. The government does not allege that defendant unlawfully obtained the information about Juror A, and an intimidating context alone does not remove the protection of the First Amendment.

## IV. CONCLUSION

For the reasons set forth above, the allegations in the indictment are insufficient to state a violation of § 373. Defendant's posts about Juror A do not solicit violence; the alleged corroborating circumstances set forth in the indictment are insufficient to transform the posts regarding Juror A into a solicitation of violence and also fail to provide the strong corroboration necessary for a lawful prosecution under § 373 and the First Amendment. Finally, all of the relevant recent case law supports the conclusion that the indictment does not charge a punishable offense. The indictment must be dismissed.[18]

**THEREFORE, IT IS ORDERED** that defendant's motion to dismiss is **GRANTED.**

---

**18.** Professor Volokh argues that speech which potentially facilitates crime should be banned only (1) when the speech is said to a few people who the speaker knows are likely to use it to commit a crime or to escape punishment; (2) when the speech, even though broadly published, has virtually no noncriminal uses (e.g., it reveals social security numbers or computer passwords); and (3) when the speech facilitates extraordinarily serious harms, such as nuclear or biological attacks. Volokh, *supra,* at 1217. Because the speech at issue in the present case is clearly protected under existing First Amendment law, I need not adopt Professor's Volokh's categories. Nevertheless, his analysis of how crime facilitating speech may be prosecuted consistent with the Constitution is cogent. As he also helpfully explains, courts should avoid deciding these types of cases based on their own view as to whether there is a legitimate public interest in the information being disseminated, as such an inquiry will likely involve opining on whether the court agrees with the individual about whom the disclosure is made. Volokh, *supra,* at 1172 ("Restricting the speech on the ground that the names aren't matters of 'legitimate public concern' is thus restricting speech based on a judgment about which side of this contested political debate is right—something judges generally ought not be doing."). Thus, the fact that I might regard as noble the struggle of Mississippi blacks for equal treatment, and defendant's views as reprehensible, is irrelevant to the constitutional analysis. Nevertheless, there is irony in the fact that defendant's right to spread a message of white supremacy has, in large part, been secured by the efforts of African–Americans to obtain civil rights.